## Illinois Central Railroad Company v. Harry C. Weiland.

1. STATUTE OF LIMITATIONS—*As to Additional Counts.*—Where additional counts, filed by leave of the court, after the statutory period has run, are but restatements of the same cause of action upon different grounds, a demurrer to a plea of the statute of limitations to such counts is properly overruled.

2. MASTER AND SERVANT—*When the Servant Will Not be Held Guilty of Contributory Negligence—A Question for the Jury.*—A servant will not be held guilty of concurrent or contributory negligence, if he continues in the employment of the master, under a promise to relieve him from extraordinary and known dangers within a reasonable time, but it is a question for the jury to say whether or not such servant was, under the circumstances, guilty of contributory negligence by continuing in such service.

3. CONTRIBUTORY NEGLIGENCE—*When a Question of Fact.*—Unless the danger be so imminent that no prudent person would undertake to perform or continue in the service, it is not a question of law, but only one of fact, whether the servant contributed to the injury by continuing in the service.

Action, for personal injuries. Appeal from the Superior Court of Cook County; the Hon. NATHANIEL C. SEARS, Judge, presiding. Heard in this court at the October term, 1896. Affirmed. Opinion filed December 14, 1896.

JOHN C. DRENNAN, attorney for appellant; JAMES FENTRESS, of counsel.

JAMES D. McSHANE, attorney for appellee.

MR. PRESIDING JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The appellee was in the service of the appellant as a switchman, and at the time of the trial, which was about two and a half years after he received the injury for which he sued, he was thirty-five years of age. The direct injury received by him resulted in the amputation of three fingers of his left hand at the knuckles, and the crooking of his little finger at the first joint. He had worked as switch-

man seven years, and at the time of the accident was earn-
ing from $3 to $4 a day.    His greatest earnings since the
accident have been $1.50 a day.

The jury gave him a verdict for $6,500, which was re-
mitted down to $4,500, and judgment for that amount
rendered.

It is urged that the court erred in sustaining appellee's
demurrer to the appellant's plea of the statute of limitations
to certain additional counts filed by appellee, more than
two years after the filing of the original declaration, on the
ground that such additional counts set up a new cause of
action.

We have examined the original and the additional counts,
and think the court properly sustained the demurrer to the
plea of the statute.    The cause of action stated was the
same in each.

The injury was the cause of action.    The various counts
were but restatements of the same cause of action upon dif-
ferent grounds.    Swift & Co. v. Foster, 55 Ill. App. 280;
Swift & Co. v. Madden, 63 Ill. App. 341.

The negligence of appellant, upon which the appellee
relies, and which was alleged in one or more of the several
counts of the declaration, consisted, first, in not furnishing
a sufficient number of men to do the work in which appellee
was assisting, to enable the appellee to perform his duty
with reasonable safety to himself, and, the dangers being
complained of and made known to appellant, a promise by
appellant, through its empowered agent, to give appellee
safer employment in a reasonable time, accompanied by a
request to appellee to continue in the work as it was until
such remedy could be furnished; second, in furnishing
appellee with a car whose appliances were defective, in that
its brake was out of order.

During the two or three months immediately preceding
the accident, the appellee had worked in the transfer yards
of the appellant, as a member of a " stake " engine crew,
engaged in the distribution of freight cars from the in-
bound yards to the out-bound yards.    Connecting such

divisions of the yards there were two parallel tracks, a portion of which were gravity tracks, extending from the top of what is spoken of as "the hill," beginning at or near one end of the in-bound yards, and inclining downward toward what is called a "puzzle" or "diamond" switch, located near the entrance to the out-bound yards. By means of such switch, cars coming down the gravity tracks were distributed to the appropriate tracks on which out-going trains were made up. The "stake" engine was operated on one of the two parallel tracks, and, by means of a stake extending from it to the corner of a car upon the other track, would push the car along to the point where the incline downward in the track began, and then leave it and go back for another car. The momentum so given to the car by the push of the engine and the downward inclination of the tracks, was calculated to be sufficient to carry the shunted car over the "puzzle" switch, and as far as necessary into the out-bound yard. As a shunted car should approach, it was the duty of the switchman waiting for it at the "puzzle" switch to set the switch so as to conduct the car upon the appropriate distributing track beyond. Signs, or marks, which he understood, would indicate to him the track for which the approaching car was destined. Then, as the car came, he would catch and climb upon it, and there operate its brake, so as to regulate its speed for its point of destination, and as it approached the car or train to which it was to be coupled, he would descend from the rear end of the car and run ahead on the ground, so as to be ready to do the coupling at the instant it should strike the car to which it was to be joined. Completing the coupling work, he was required to get back to the "puzzle" switch in time to repeat a like duty with reference to the next car that should be shunted down the gravity track. This, it was testified, was lively work, and kept the switchman on the run.

Appellee testified that on the day in question when he reached the top of the car and took hold of the brake, he noticed that the brake did not work effectually, but that he

did the best he could with it, and when he supposed he had sufficiently reduced its speed, he descended to the ground and ran past the car to its front end in order to couple it to the standing car ahead.

Reaching there while the shunted car was yet in motion and about ten feet distant from the car ahead, and looking forward to the standing car, he saw that there was in that car a coupling link which would prevent the coupling of the two cars if the link which was in the moving car were not removed. He, accordingly, "hustled" to throw out the link in the moving car, with his right hand, and as the cars were about to come together he stooped and reached his left arm under the "dead-woods," which were on both cars, and extending his hand upward to guide the link into its place, the moving car came so rapidly that his hand was caught and his fingers crushed.

It is claimed that the accident would not have happened, except for the rapid approach of the shunted car, and that because of the defective brake, its speed could not be sufficiently lessened by the appellee within the short time intervening between the time when he was obliged to mount the car at or near the switch, and when he had to dismount in order to be ready to do the coupling.

It does not appear with certainty just how much time did so elapse, but the distance that the car had to traverse was not great, considering what had to be done.

It did appear that it was a box car, and that the brake was on its front end; that the ladders or steps were on the ends and not on the sides of the car; that it was hazardous to mount or dismount except at the rear end of a car so moving, lest in case of a slip or a fall, the car would run over the person who should fall, and that it was customary to use only the rear ladders. After mounting, it was, therefore, necessary that the appellee should, as he did, go from the rear to the front end of the top of the car, there operate the brake so as to properly adjust the speed of the car, then pass back to the rear and descend to the ground and run along past the car to its front end and make the coupling.

And it was made to appear, as is nearly obvious, that to do what was so necessary, required very quick work, and we may say, required the exercise of much judgment, agility, dexterity and exactness.

It was also shown that it was dangerous work, which may readily be perceived.

Upon the question of whether the brake was, or not, defective, in that its shoes were so worn as to imperfectly press upon the wheels of the car, there was a contrariety of opinion among the witnesses.

The appellee testified that he instantly felt, when he began to operate the brake, that it was not fully performing its proper work; that the brake-shoes were too much worn; and it is altogether probable that a person accustomed to braking, as he was, may in that way immediately detect the imperfect application of such an appliance.

On the other hand, it was shown by several witnesses for the appellant, who either examined the brake or had the opportunity of observing it, that they saw nothing that interfered with its effectiveness.

It was also shown by appellant that a general system prevailed of inspecting all cars entering and departing from the yards, and that the inspector's minutes showed that this car had been examined the day before, and while reporting that some of its door boards were broken, the minutes were silent as to the condition of the brake-shoes, and it is urged that from such fact of silence the inference is that the shoes were in good order.

In connection with this subject, it should be stated that the car in question did not belong to appellant, but was what is called a foreign car, and that it was testified by two of appellant's car inspectors, on cross-examination, and not contradicted, that the policy pursued in making an inspection was to report no defects in a foreign car unless they were of a kind that absolutely required to be repaired in order that the car could be got off appellant's road in safety.

We do not see that we may say, that as a matter of law,

there was not enough evidence, considering the evidence and all legitimate inferences that could justifiably be drawn from it, to warrant the submission of the case to the jury under the count of the declaration which alleged the negligence of appellant to consist in the furnishing of the imperfect brake, whereby the speed of the car could not be properly and safely regulated.

The question of whether the appellee was, at the time of the injury, in the exercise of due care for his own safety, is closely associated with the other question, whether appellant was negligent in failing to furnish a sufficient number of switchmen to enable appellee to perform his duties in reasonable safety.

We have already stated, in substance, what was being required of appellee in the performance of his duties.

It was proved in the case, and not contradicted, that it was not customary, except in the case of "stake" engine crews, for switchmen to do both switching, car-riding, and coupling.

It was also proved, that some time before, when appellee worked with the stake engine crew, six men did the work that four men were required to do when he was put back at the same work about three months before he was injured; that upon the man protesting that four men were not sufficient to do the work, the yard-master added a fifth man, which was the number of the crew when appellee was hurt.

When six men comprised the number, one of them attended the "puzzle" switch, leaving the others to catch and ride the cars and couple them.

With but five in the crew, each car rider and coupler did the switching also, and such was the method of working at the time of the accident.

Just before the fifth man was put on, the crew, by a committee of their number, made a protest to the yard-master, on the ground that it was dangerous for four men, constituting the crew, to do the work. The yard-master made no response in words, but within a few days he added a fifth man. The addition of this man did not change the respect-

ive duties of each of the crew—they still were required to do switching, riding and coupling—but it gave them more time to return to the puzzle switch, and be prepared for the cars that were shunted down the gravity tracks for distribution.

About two weeks after the fifth man was put on, the appellee, as he testified, went again to the yard-master, and said to him : " Jake, how about changing off this engine; this work is too dangerous, and there is too much running; it is too hard work all round;" and the yard-master answered : " Well, I will see what I can do for you." No change being made, appellee, as he testified, about three days before he was hurt spoke with the yard-master again, as follows :

" I says, ' Jake, I want a job off of this engine. The work is too dangerous;' and I says, ' I ain't going to stay here any longer,' or something similar to that. And he says, ' All right,' he says, ' I will take you off of here in just a day or two,' he says, ' stay there for a day or two longer.' "

The yard-master denied having had either of the said two separate interviews with appellee, and that he made any such statements or promises to him.

It seems to be admitted that the yard-master was the officer of the appellant who had control of all such matters, and that in him lay the power of employment and discharge of all who worked under him.

And we think it to be clearly a question of fact for the jury to say, under the evidence, what the truth of the matter was concerning the promise testified to by appellee as having been made by the yard-master.

If such promise were made, and the jury must, by their general verdict, be considered to have so found, then as a matter of law it seems to be settled, that, relying upon such promise, the appellee can not, as a matter of law, be held to have assumed the special risk of the dangers of which he was complaining. Anderson Pressed Brick Co. v. Sobkowiak, 148 Ill. 573.

He did, of course, assume the swichmen's ordinary dan-

gers, but the special dangers arising from lack of sufficient force to do the work at which he was put, in reasonable safety, we think he may not be held to be responsible for, after the promise was made, and he was told by his superior to continue at work until the promise could be fulfilled.

It was said, in Northern Pacific R. R. Co. v. Herbert, 116 U. S. 642 (p. 648):

"The servant does not undertake to incur the risks arising from the want of sufficient and skillful co-laborers, or from defective machinery or other instruments with which he is to work." See, also, Swift & Co. v. Rutkowski (No. 6510 this term).

As a matter of law, the servant will not be held guilty of concurrent or contributory negligence, if he continues in his employment under a promise to relieve him from the extraordinary, though known, dangers, within a reasonable time, but it is a question for the jury to say whether or not he was, under such circumstances, guilty of contributory negligence. Hough v. Railway Co., 100 U. S. 213; Anderson Pressed Brick Co. v. Sobkowiak, *supra;* Furnace Co. v. Abend, 107 Ill. 44.

Unless the danger be so imminent that no prudent person would undertake to perform or continue in the service, it is not, under such circumstances, a question of law, but only one of fact, whether the servant contributed to the injury by continuing in the service. Anderson Pressed Brick Co v. Sobkowiak, *supra.*

That no such extreme and imminent danger existed in the case at bar, as would make the rule, just stated, applicable to the appellee, is apparent from the fact that the work as done was participated in by the entire crew, of which appellee was a member, both before and up to the time when the alleged promise was made.

We regard the question as being an exceedingly close one, whether a recovery may be sustained in this case, first, as to whether the appellee, after discovering, as he observed, that the brake was deficient in its applying force to the car

wheels, was justified in attempting to make the coupling, especially after he saw the fact that the car ahead had a coupler in it, as well as that the shunted car was in the same condition, thus requiring more work than usual to be done in less than the customary time; or, second, whether there was such a preponderance of evidence as the law requires to warrant the finding that in fact the new promise and request to continue in the work, were made as the appellee testified, and that relying upon such promise, he continued in his work. But in view of the weight which, under the law, we are bound to yield to the verdicts of juries upon pure questions of fact, we are disinclined to disturb the judgment, which is apparently quite reasonable in amount, if any recovery can be had.

No instructions were asked by the appellee. Of the many offered by the appellant, some were given as asked, others were given in a modified form, and still others were refused altogether.

They are too numerous to discuss in detail, but from a consideration of them all, we think the jury were fully and fairly instructed as to the law of the case, and that no substantial error was committed by the trial court concerning them.

It is urged as error that counsel for appellee made improper remarks in his argument to the jury. We do not think the remarks complained of can be said to constitute serious error, and refer to Harms v. Stier, No. 6574, this term.

Other questions have been argued, but what we have said concerning what we regard to be the controlling features of the case, must suffice.

The judgment of the Superior Court will be affirmed, and it is so ordered.